Okay counsel, this is Judge Wallace. Before we start the clock, I just want to caution both counsel that this is a difficult situation for you and for us because we can't see each other so you don't get the nonverbal cues. When we start talking, please listen so that you can stop and not waste your time because we're going to be wanting to ask questions. So that's for both of you. You understand me? Yes. Yes, your honor. Okay. Ms. Frey, you've asked to reserve three minutes. When that chime goes off, I'm going to try to interject to remind you that you're in your rebuttal time and if you want to keep eating it up, that's up to you but I just want to let you know. So thank you. You can go ahead and start Ms. Frey. May it please the court. My name is Jude Frey and I am here on behalf of Singapore Asahi Chemical and Solder. Ms. Frey? Yes. This is Judge Wallace. I have a couple of questions for you. Sure. In the blue brief at 51 and 52, you discussed the SymTech test which purportedly showed that adding 0.2 weight percentage of impurities to example 7 of Yamaguchi 874, it would quote a fail outside the scope of independent claim 10. But the PTAP found that it was, and I'm quoting from there, only by affirmatively and purposely adding impurities to what appeared to be routine starting materials that you obtained test results showing decreased fatigue life. How can you base an argument on those tests? Your Honor, we based the argument on those tests just to show that at the time of the invention, the state of the art was that these solders could have lead alloys present up to 0.2 weight percent as impurities. So we took then a sample with low impurities and then doped that to show that the addition of 0.2 weight percent lead could, in fact, be detrimental to fatigue life. In the gray brief at 28, you accused Apple of disingenuous. I assume you believe that's a bad thing. How would you define being disingenuous? Well, Your Honor, I don't know that disingenuous is the proper word here, but I think the claim was that we did address those other issues and gave our reasons for those. Ms. Prye, my question was how you define disingenuous. Well, Your Honor, we did address the other reasons that Apple is saying that we did not address. We addressed all of those points. Ms. Prye, you're not answering my question. Think of it as you're a dictionary. Define disingenuous for me. Well, it's stating something that might not be correct. Okay. Now, let me direct you to the gray brief at 25, where you argue that, I'm quoting, at most, Dr. Wang's testimony shows that a skilled artisan, ellipsis, would have been able to design out the impurities in the alloys disclosed in Yamaguchi 874, which is a question of enablement, citing Apple's explanation of the PTAF's finding in the red brief. But in its final written decision, the PTAF said that Dr. Wang, quote, repeatedly described the base composition, close quote, depicted in the SimTech test, quote, as the composition of example seven of Yamaguchi 874, and ellipsis, did not identify particular steps taken to remove impurities from the base composition, close quote, and did not indicate, quote, that the starting materials used in the test were of higher purity than what would have been used, close quote, at the time of the invention. Why didn't you quote from the PTAF's opinion itself, which clearly refutes your position here? And isn't that failure to quote disingenuous? No, I don't believe it is, Your Honor, because we also quoted from Dr. Wang's testimony to explain that when she was talking about this base composition, she explained that it was one where it was engineered to take out impurities. And then from that, she used that to dope it with, like, 0.2% lead, which was a known impurity, according to the standards that existed in 1996 for electronic-grade solder alloys. So I think we pointed out that her testimony refuted that. When she explained, we started with the low-impurity materials. And that doesn't necessarily mean that Yamaguchi 874 started with those materials, because we just don't know what they started with. We know there were impurities in their solder alloy. The board even made a finding that there would have been impurities in their solder alloy. And then the board made a finding that those impurities would necessarily have been at very low levels, such that they would not materially affect the basic and novel properties of the alloy. The board only found this low level of impurity limitation by combining Yamaguchi with other evidence in the record. There is no explicit showing that Yamaguchi, expressly in its disclosure, has some kind of information that would tell you that it necessarily used low-level impurities. And the board only got to that finding that that limitation was present by combining Yamaguchi with the record to find that overall limitation, which our position is that is a violation or a misapplication of the legal standards for anticipation. And when you look at the board's decision, you see where it talked about its impurity findings. It made multiple references to the evidence of record. And its overall conclusion on impurities was, considering the record as a whole, we're not going to cause the composition to fall beyond the scope of Claim 10. But that's really the point here, is we all know there were impurities there. We don't know what the levels were. We don't know what the impurities were. So you can't just read in a teaching that those impurities were necessarily very low, just so that they did not impact any of the basic and novel characteristics of the invention. And this is particularly true, because in this time frame, designing out or controlling impurities in alloys or using ultra-pure alloy compositions was the exception, not the norm. We pointed out that this joint industry standard allowed for up to 0.2 weight percent lead. We also included a reference in the record, Tanaka, a Japanese unexamined patent application published in 1997, same time frame, for lead-free solder alloys. And it specifically taught that, quote, lead is allowed with the upper limit of 1%. This is further evidence that the norm, even in Japan, was the presence of higher levels of impurities in electronic-grade solders. We also had evidence, a publication dated 2001, called Lead Contamination in Lead-Free Electronics Assembly, which stated that, quote, unfortunately, in the past, the presence of That reference also included a fatigue test results table at Appendix 1419 showing fail for lead-free alloys that they doped at 0.5 and 1 weight percent. So it's our contention here that the board misapplied the legal standards for anticipation by essentially combining Yamaguchi with evidence of the record to read into this limitation that the impurities were at necessarily very low levels that would not impact the basic and novel characteristics of the invention. At that time frame, even for lead-free solder alloys, there's evidence that they used up to even 1 weight percent lead in those. So you cannot look at the disclosure of Yamaguchi and find, oh, yeah, the impurities that we all know were in there were necessarily at a very low level. That just doesn't... That teaching does not exist in there. And in order to find that teaching, what the board did was it took Yamaguchi and it did the same thing with lead, combined those references with other evidence in the record. Oh, okay. You're up against your rebuttal time. I'll reserve my rebuttal. Okay. Thank you. Ms. Chang? May it please the court, this is Carolyn Chang for Apelli Apple Inc. Unless the panel has any specific questions, I'd like to start by addressing what Ms. Fry was talking about and what was characterized in the briefing as a misapplication of the participation standard. And I think the thing that we need to make clear and remember first is that when the board reviewed the prior art references, Yamaguchi and Lee, what it found was on the face of the prior art references, it disclosed the listed ingredients as required by the patent claim and made no mention and no disclosures about any other ingredients. So in that respect, the board found correctly that the prior art references met the consisting essentially of limitation of the listed ingredients because there was no indication on the face of these prior art references that there were any other ingredients that would affect, materially affect any basic and novel property of the invention. So that in and of itself shows that there was no misapplication of the burden. Apple met its initial burden, the board found that, and what was really being discussed in the analysis is Asahi's attempt to overcome that burden and Asahi's attempt to import inferences into the prior art references as to whether there were any impurities and whether those impurities would materially affect fatigue resistance specifically, but any of the basic and novel properties. And I think as the board has noted, I mean, as the panel has noted here, the evidence there, the board's analysis is supported by substantial evidence. They reviewed everything that Asahi submitted, specifically the SimTech test and found that they were not persuasive, specifically in that case, because what they were testing was impurities added to what was actually disclosed in the Yamaguchi 874. So what they were testing was not even what was disclosed in the prior art reference, but a compound that had added impurities. So that analysis is in fact irrelevant to whether the prior art reference itself disclosed what was claimed in the patent. So I think from that perspective, there was not an error with respect to how the board analyzed the anticipation argument. As to the other legal errors that Asahi is claiming, first with respect to claim construction, there is in fact no dispute regarding what was the proper claim construction of consisting essentially of. Everyone agreed in the IPR proceeding that it had its well-established and ordinary meaning of including the listed ingredients, and it may include but does not have to include other ingredients that does not affect the material property. I think the only dispute here is that Asahi takes issue with the fact that the court did not list specifically the fatigue resistance as a basic and novel property in the actual construction it adopted. But as the board noted, it did in fact consider fatigue resistance to be a basic and novel property. I don't think that was actually in dispute. Apple agreed that it is a basic and novel property, and the reason we didn't want to include a relevant property of these alloy compounds. So there is no error, there is no misapplication of the claim construction. So the final claim of legal error that Asahi makes is this idea that the board conflated the enablement and anticipation standard and found anticipation based on a finding of enablement, and that is just a mischaracterization of what the board was discussing. In fact, what the board was saying was that there was no enablement argument being made here, so it couldn't make any finding with respect to whether the disclosures in the prior art references were sufficient to make a high purity compound. And that's, you know, essentially what Asahi is arguing here now. And the board said, I can't make that determination, all I can say is on the face of these prior art references, it disclosed the required ingredients, and there were no disclosures or indication of any other ingredients, and therefore the limitation was met. And I think with that understanding and that proper reading of the board's decision, we can see that there was no error in conflating enablement and anticipation. With respect to the other arguments advanced by Asahi, those are all arguments based on the board's factual determinations, which we submit under our brief that those were all justified by substantial evidence as set forth in the board's written opinion. And unless the panel has any questions, I have nothing further. I don't hear anything, so thank you very much. Ms. Frey? Yes, just a couple points. On the issue of anticipation, there is a consisting essentially of limitation in this claim that included unlisted ingredients, that's part of that claim, and we all know there were unlisted ingredients in these prior art alloys, and we know that based on the evidence from all the experts, and the board made a finding that there would be these impurities in these alloys. So the question is, well, what would those levels of impurities been? We don't know the answer to that. We don't know what the impurities were. But it's interesting because that consisting essentially of language made it into that claim based on the English abstract of this Yamaguchi 874, and it was added, was changed from comprising to consisting essentially of, because the examiner argued that the alloys in this 874, what it would have included impurities at levels that could have detrimental effects on the claimed invention. And by kind of ignoring this unlisted ingredients, even though we know it's there, and that it mattered here, we're basically writing that language out of the consisting essentially of claim, especially when we know why it was added. One other point I'd like to make is on the obviousness ground number five based on Yamaguchi 923 in the teaching away, the board found based on overlapping ranges, a prima facie case of obviousness. But the reference itself, and there was only one reference as part of this ground. The reference itself said that with regard to the business limitation, that if you go below five weight percent, which is R, that's R claim level, that it would be impossible to achieve adequate melting point and adequate wettability, which are prerequisites for a teaching away. The board had no evidence other than the prima facie. We made a teaching away rebuttal and the board did not address it. And I heard the bell ring, so I'm assuming my time is up. Indeed it is. Well, thank you.   Thank you. Thank you. Thank you. Thank you. Thank you.